WESTERN WORLD INSURANCE
COMPANY, INC.

v.

HARFORD MUTUAL
INSURANCE COMPANY.

Civ. A. No. M–83–2599.

United States District Court,
D. Maryland.

Oct. 31, 1984.

On Motion for Reconsideration
Dec. 19, 1984.

Howard J. Schulman, Baltimore, Md., for plaintiff.

Frank X. Gallagher, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This is a civil action brought by Western World Insurance Company, Inc. (Western World) against Harford Mutual Insurance Company (Harford). Plaintiff seeks a judicial determination of the respective rights and liabilities of the plaintiff and defendant insurers in connection with the defense and coverage of the defendants in a case filed in this court in 1982, entitled *Sampson v. Mears, et al.,* Civil Action No. M–82–2263.

The present case was tried without a jury on October 1 and 2, 1984. This Memorandum constitutes the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52, whether or not specifically so denominated. Due regard has been given to the credibility of the witnesses.

### I. *Findings of Fact*

On August 8, 1981, Officer Scott Mears was on duty as a uniformed police officer of the City of Cambridge. After observing two cars which appeared to be racing, Officer Mears and his partner gave pursuit. When one of the vehicles stopped, the officers continued to pursue the other vehicle, driven by Timothy Sampson. Following a high speed chase through residential areas, the vehicle driven by Sampson drove into the school grounds of St. Claire Elementary School. When Sampson jumped out of his car and began running, Officer Mears gave chase on foot.

Around the corner of the school building, Sampson turned toward Mears. Mears, believing that Sampson had a gun and was about to shoot, drew his service revolver and fired one bullet at Sampson. This bullet apparently ricocheted off of a wall behind Sampson, and then struck Sampson in the head. The gun that Mears believed he had seen was not found, but a rolled up cap was found in Sampson's hand.

The plaintiff asserts that Officer Mears fired by reflex action without aiming at anything. The evidence is clear, however, that Officer Mears shot at Sampson.[1]

It was the policy of the Cambridge Police Department that its officers were not to fire warning shots at any time.[2]

Officer Mears was indicted for common law battery, assault with intent to murder, and the use of a handgun during a felony. The case was tried before a jury in the Circuit Court for Kent County on December 14–16, 1981, and Mears was acquitted on all counts.

On the date of the shooting, two insurance policies were in force which are relevant to this case. First, the City of Cambridge was covered by a general comprehensive liability policy issued by Harford,[3] through Harrington Insurance Agency (Harrington). This policy required Harford to:

"... pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury, or

B. property damage

to which this insurance applies, *caused by an occurrence*, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage." [Emphasis added.]

The policy defines an "occurrence" as being:

"... an *accident*, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from*

*the standpoint of the insured.*" [Emphasis added].

This policy contained an endorsement form, under which the "persons insured" provision was amended to include as additional insureds "any employee of the named insured while acting within the scope of his duties."[4] There is no dispute that Officer Mears was acting within the scope of his duties when the incident occurred. Additionally, the policy provided that it afforded primary insurance, with a limit of liability stated as $1,000,000.

In addition, there was in force a law enforcement liability policy issued by Western World through Harrington, as procuring agent, insuring the Cambridge Police Department, the Mayor and City Council and Police Commissioners of Cambridge.[5] The Western World policy promises to:

"... pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of negligent acts, errors or omissions of the insured as follows:

Coverage A—Personal Injury

Coverage B—Bodily Injury

to which this insurance applies, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or bodily injury..."

The Western World policy defines "bodily injury" as:

"bodily injury, sickness or disease sustained by any person accidentally caused by any act of the insured in making or attempting to make an arrest while acting within the scope of his duties as a law enforcement officer."

---

1. Mears testified at this trial that he had shot at Sampson out of fear for his own life. This testimony is consistent with Mears' prior testimony in his criminal trial (DX 6, Transcript of *State v. Mears*, Criminal No. 2904 in the Circuit Court for Kent County, Maryland, at 268) and with the testimony given by Mears in a deposition taken of him in the underlying tort case (DX 6, Deposition of Scott B. Mears, Sr. in *Sampson v. Mears, Civil No. M–82–2263*, taken April 28, 1983, at 75).

2. This fact was confirmed by both Mears' testimony and the Rules and Regulations of Cambridge, Maryland Police Department, submitted as DX 10.

3. PX 2, Policy No. SMP 19220220.

4. *Id.*; form L9106.

5. PX 1, Policy No. LEL00127.

The policy defines "personal injury" in pertinent part as:

"... *assault and battery*, if committed while making or attempting to make an arrest...."

[Emphasis added]. The policy specified that it was:

"... excess insurance over any other valid and collectable insurance available to the insured...."

The limits of the Western World policy were $100,000 for each person and $300,000 for each incident.

Western World received notice of the shooting on September 3, 1981, by virtue of a loss notice sent from All Risks, Ltd., Western World's general agent, to which Harrington had reported the incident.[6] Upon receipt of this notice, Western World retained Crawford & Co., an adjusting company, to investigate the shooting. Robert Purnell of Crawford & Co. handled the investigation, and on October 22, 1981, he submitted a report to Western World indicating that Mears' criminal trial was scheduled to begin on December 14, 1981, and recommending that the trial be monitored.[7] Due to the pending criminal charges against Mears and the subsequent criminal trial, most of Mr. Purnell's investigation was not done until mid-1982. On June 11, 1982, Purnell sent a report to Western World, in which he described the shooting as follows:

"In an effort to avoid the police, Sampson drove the vehicle onto a school yard across basketball courts and tennis courts and spun around hoping to elude the police, however, Officer Mears' police cruiser was blocking the entrance and Sampson could not get off the school property. He attempted to ram the cruiser, however, stopped short of doing this, then jumped out and began running.

Officer Cheeseman jumped out and yelled 'police' and at that point, Sampson turned with an object in his hand. It was believed to be a gun, however, later turned out to be a hat that was rolled up. At this point, Officer Mears fired his weapon at Sampson who was approximately fifty feet away from him and running. It was later proven that the bullet from Mears' weapon struck a brick wall of the school and ricocheted back striking Sampson behind the left ear, entering his skull and lodging behind his right eye." [8]

Purnell recommended that Western World deny liability for the shooting, and Western World did deny liability.

On August 5, 1982, Timothy Sampson filed a civil complaint in this court,[9] alleging violations of 42 U.S.C. § 1983, and naming as defendants Officer Mears, Police Chief Russell E. Wroten of the Cambridge, Maryland Police Department, and the Mayor and Commissioners of the City of Cambridge. The complaint alleged that the shooting of Sampson by Mears was wrongful, or "so wantonly or grossly negligent as to constitute willfulness." [10] With respect to Chief Wroten and the City, the complaint alleged that they were vicariously liable for the acts of Mears and that they were independently liable for negligent hiring and supervision.[11]

Upon receipt of the complaint from Harrington, Western World retained Edward Mackie, Esq. to defend all defendants in *Sampson*. At that time, Lynn Rupp, Western World's claims adjuster, advised the defendants in *Sampson* and Harrington that there were possible coverage problems. On August 18, 1982, Harrington sent notice of the suit to Harford.[12] Apparently, this is the first notice that Har-

---

**6.** DX 1.

**7.** DX 3.

**8.** DX 2 at 4.

**9.** *Sampson v. Mears, et al.,* Civil Action No. M–82–2263, Paper No. 1.

**10.** *Id.,* Count I at ¶ 15.

**11.** *Id.,* Counts II, III, V, and VI.

**12.** PX 25.

ford had received regarding either the incident or the suit.[13]

On August 19, 1982, Mr. Rupp sent letters of reservation to the defendants in *Sampson*. On September 14, 1982, Richard Matthews, the City Attorney of Cambridge, sent a letter to Western World contesting the reservation of rights, indicating that, because a conflict existed between the interests of Mears and the other defendants, the City and Chief Wroten had engaged Francis B. Burch, Esq. to represent them, and requesting that Western World agree to pay the cost of Mr. Burch's services.[14] Western World agreed to this request on September 20, 1982.

On September 30, 1982, Mr. Rupp telephoned Charles Foley, the claims adjuster for Harford, and was told that Harford had made no decision as to whether it would provide a defense or indemnification. On October 25, 1982, Harford received a letter from Western World, dated October 8, 1982, formally tendering the defense in *Sampson* to Harford.[15] Mr. Rupp subsequently called and wrote Harford on several more occasions, because he had received no response. Finally, on June 14, 1983, Mr. Foley advised Mr. Rupp that Harford would take no action in *Sampson* and would not contribute to a defense or provide indemnification.

Meanwhile, on December 17, 1982, this court dismissed some of the claims against Chief Wroten and the City, and on July 18, 1983, a stipulation was filed in *Sampson* in which all remaining claims against Chief Wroten and the City were dismissed, leaving Officer Mears as the only defendant.[16] Also on July 18, 1983, Western World filed this suit against Harford. As the trial date

in *Sampson* approached, Mr. Rupp contacted Mr. Foley and invited him to participate in settlement negotiations, but Mr. Foley declined. Shortly before trial in *Sampson*, Western World and Sampson reached a settlement agreement, pursuant to which Western World paid Sampson $45,000,[17] and Sampson executed a general release. At trial in the present case, the parties stipulated that the $45,000 settlement was a fair and reasonable one.

With respect to attorneys' fees, it was stipulated at this trial that 85% of Mr. Mackie's fee was to represent Officer Mears, while the remaining 15% was to represent Chief Wroten and the City. Mr. Burch's time was devoted entirely to representing Chief Wroten and the City. It was also stipulated that the total fee of Mr. Mackie was $9,392.25 and of Mr. Burch was $19,416.58 and that both fees were fair and reasonable. All fees were paid by Western World. In addition, Western World paid $420.75 to Crawford & Co. for its investigation and deposition costs of $403.65.

After the settlement in *Sampson*, Western World obtained an assignment of rights from Mears, Wroten, and the City of Cambridge.[18]

## II. *Conclusions of Law*

The plaintiff contends that the acts of Officer Mears toward Sampson constitute an "occurrence" within the meaning of Harford's policy and, therefore, requests this court to find Harford liable for (1) all defense costs in *Sampson*, (2) the $45,000 settlement, and (3) the costs of bringing this action. Harford asserts that the

---

**13.** Western World contends that Harrington is the general agent of Harford and that, therefore, Harford had notice of the claim much earlier than August 18, 1982. No evidence as to whether Harrington is Harford's general agent, however, was presented at trial. In any event, the court finds that this information is not necessary for resolution of the case, as the *Sampson* case was not filed until almost one full year after the shooting, by which time it was clear that the shooting was an intentional act excluded from coverage under the Harford policy.

**14.** PX 4.

**15.** PX 13.

**16.** DX 11, Paper No. 37 in *Sampson v. Mears*, Civil Action No. M–82–2263.

**17.** PX 19, Western World check No. 27513 made payable to Timothy Sampson and his attorneys in the amount of $45,000.

**18.** PX 5–7.

shooting was an intentional act, covered by Western World's policy but not by Harford's, and that this fact was clear when the underlying action was filed. Harford asserts that it is not liable for any of the costs, either in this case or in *Sampson*, and that it is not liable for the settlement.

The standards for determining coverage and an obligation to defend are different and will be examined separately as they apply to the facts of this case.

### A. Coverage

In a Memorandum and Order issued September 7, 1984,[19] this court held that notwithstanding its earlier finding that Harford had a duty to defend, Harford was not precluded from asserting at trial of the present case that it had no liability on the underlying claim. Whether coverage exists depends upon whether the acts of Officer Mears fall within the parameters of Harford's policy. There is no dispute that the incident is covered by Western World's policy, nor is there any dispute that Western World's coverage is excess coverage, which becomes effective if, and only if, the incident is not covered under Harford's policy.

Harford's policy covered only an "occurrence," defined in the policy as an "accident" which results in "bodily injury neither expected nor intended from the standpoint of the insured." Harford argues that the shooting was an intentional act and, therefore, not covered by its policy. This court has found that Mears drew his gun and fired, intending to shoot at Sampson. Nevertheless, Western World has made two arguments in which it claims that, even under these circumstances, the act involved here is covered by Harford's policy.

First, Western World argues that, even assuming that Mears intended to shoot Sampson, the shooting is an "occurrence" under Harford's policy because Mears had no specific intent to injure Sampson. This argument is without merit.

■ The general rule is that only intentional injuries are excluded under policies such as Harford's and that, therefore, coverage exists for the unintended results of intentional acts. *See* 7A Appleman, Insurance Law and Practice, § 4492.02. This rule has been applied to situations involving shootings, where the insured did not intend to injure the individual who was shot. *See, e.g., State Farm Mutual Insurance Co. v. Worthington,* 405 F.2d 683 (8th Cir.1968) (coverage available where warning shots struck individual); *Grange Mutual Casualty Co. v. Thomas,* 301 So.2d 158 (Fla.1974) (coverage existed where person was injured during family quarrel, and insured may have intended to shoot another person); *Smith v. Moran,* 209 N.E.2d 18 (Ill.1965) (coverage existed where injured individual was standing next to person at whom the insured was aiming); *Jackson v. Lajaunie,* 253 So.2d 540 (La.1971) (coverage where insured shot person during horseplay with gun thought to contain blanks); *Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (1973) (remanding for new trial, and stating that, if the insured's intent was to fire a warning shot, but he unintentionally fired prematurely, then coverage existed); *Otterman v. Union Mutual Fire Insurance Co.,* 130 Vt. 636, 298 A.2d 547 (1972) (court found coverage where bullet fired by insured went through wall and struck a police officer, whose presence was unknown to the insured).

Courts have also held uniformly that where an insured has shot an individual intentionally, coverage will be denied even where the injury inflicted is different or more severe than intended. *See, e.g., Stout v. Grain Dealers Mutual Insurance Co.,* 307 F.2d 521 (4th Cir.1962) (no coverage where insured shot and killed "peeping tom"); *Hartford Fire Insurance Co. v. Wagner,* 296 Minn. 510, 207 N.W.2d 354 (Minn.1973) (no coverage where insured shot his companion intending to injure, but the companion was killed); *Lyons,* 310 A.2d 458 (in remanding for trial, court stated that if the insured intended to maim or kill

19. Paper No. 25.

the person who was shot, then no coverage existed).

■ Intent to injury may be shown by proof of actual intent to injure, or it may be inferred from the nature and character of the act. *See, e.g., Home Insurance Co. v. Neilson,* 165 Ind.App. 445, 332 N.E.2d 240, 243 (1975); *Smith v. Senst,* 313 N.W.2d 202, 203 (Minn.1981); *Casperson v. Webber,* 298 Minn. 93, 213 N.W.2d 327, 330 (1973); *Travelers Insurance Co. v. Cole,* 631 S.W.2d 661 (Mo.1982).

In *Cole,* for example, the Missouri Court of Appeals held that intent to harm could properly be inferred where the insured discharged a gun pointed at a police officer. The court stated:

"Injury or damage is intentional if the insured acts with the specific intent to cause harm or if the insured's intent to harm is inferred as a matter of law from the nature and character of the act.... Intent to harm is inferred if the natural and probable consequences of an act are to produce harm....

The insured's actions in discharging a gun at Officer Didden in the insured's residence was a dangerous act from which harm was almost certain to result.... The trial court could properly infer the insured's intent to harm from such facts."

631 S.W.2d at 664 (citations omitted).

■ In this case, it is clear that Mears, afraid that his own life was in danger, drew his gun and fired one shot at Sampson. The fact that the bullet ricocheted off the wall before striking Sampson indicates only that the injury inflicted was different from that intended, which, under prevailing law, does not detract from the intentional nature of the act. Furthermore, whether or not Mears stated that he actually intended to inflict injury upon Sampson is not important, as such intent can be inferred from the nature of his act of shooting at Sampson.

■ The second argument on which the plaintiff bases its claim that the shooting constituted "an occurrence" is that even the intentional result of an intentional act is within the coverage of an insurance policy such as that issued by Harford, where the intentional act is justifiable because done in self-defense. Harford does not contest the fact that the shooting was in self-defense, but asserts that, whether in self-defense or not, the intentional result of an intentional act is not covered by its policy.

Western World cites several cases in support of its position, but the court does not find them convincing. For example, in *Walters v. American Insurance Co.,* 185 Cal.App.2d 776, 8 Cal.Rptr. 665 (1960), the court construed a policy that excluded "intentional" acts, without defining the term. After finding the term ambiguous, the court looked to the California Insurance Code, which stated that insurance companies were not liable for damage resulting from "wilful acts." After determining that "wilful" connoted some degree of wrongfulness or culpability, the court held that the act of self-defense was not intentional.

In *Brasseaux v. Girouard,* 269 So.2d 590 (La.App.1972), the Court of Appeals of Louisiana held that when a person has an honest belief that he is faced with a situation calling for self-defense, and he intentionally inflicts personal injury as a result, he is not excluded from coverage even if he was negligent in assuming that he had a right to defend himself. On rehearing, however, the court found that the insured in that case had acted unreasonably in defending himself, and therefore the act was intentional and excluded from coverage.

Finally, in *Putman v. Zeluff,* 372 Mich. 553, 127 N.W.2d 374 (1964), the insured teenage boy shot a pedigreed hunting dog thinking that it was a wild dog about to attack him. The court noted that, although he intended to fire the gun and intended to stop the dog, there was a question as to whether he intended to destroy it. On this basis, the court held that coverage existed.

These authorities are limited in number and scope compared to the number of cases which have held specifically that a possible justification of self-defense does not save

an otherwise intentional act from an intentional injury exclusion. *See, e.g., Hartford Accident and Indemnity Co. v. Krekeler,* 363 F.Supp. 354 (E.D.Mo.1973), *rev'd on other grounds,* 491 F.2d 884 (8th Cir.1974); *Lockhart v. Allstate Insurance Co.,* 119 Ariz. 150, 579 P.2d 1120 (1978); *Clemmons v. American States Insurance Co.,* 412 So.2d 906 (Fla.1982); *Heshelman v. Nationwide Mutual Fire Insurance Co.,* 412 N.E.2d 301 (Ind.1980), *rehearing denied* (1981); *Home Insurance Co. v. Neilsen,* 165 Ind.App. 445, 332 N.E.2d 240 (1975); *McAndrews v. Farm Bureau Mutual Insurance Co.,* 349 N.W.2d 117 (Iowa 1984). These cases held that an intentional act, even if in self-defense, is excluded from coverage under an intentional act exclusion.

In *Clemmons,* the court found no difference, with respect to coverage, between a robber who shot an individual who was pursuing him and an individual who shot in self-defense.

"Each did the same act: intentionally discharging a firearm while intentionally aiming it toward another human being. Each caused the same obviously foreseeable immediate result: the projectile intentionally sent forth struck the human to which it was intentionally directed and, as was to be expected, inflicted serious bodily injuries. Each did his act for a specific ultimate purpose or motive: Draffen to avoid being caught, Leeper to avoid harm to himself. Each can fairly and charitably be assumed to have preferred to accomplish his ultimate purpose (the avoidance of capture or the avoidance of harm to himself) without the necessity of causing injury to another. Each found he was in a dilemma and had to make a choice between inflicting injury on another or not achieving his ultimate desire. Each made a decision and decided to inflict injury rather than suffer the alternative presented. Without regard to the difference between Leeper and Draffen, morally and under criminal law concepts, when each intentionally caused bodily injuries to another by intentionally shooting him, each acted with-

in their insurance policy exclusion, notwithstanding that the ultimate purpose of each was to accomplish a distant objective or goal quite beyond and detached from the intended act of shooting and the immediate obvious result of thereby inflicting serious bodily harm."

412 So.2d at 909.

In *Lockhart,* the Court of Appeals of Arizona held:

"The insurance policy excludes coverage for an intentional act of the insured which was intended to cause injury or which could be expected to cause injury. The question of self-defense presents an issue of motive or justification for an intentionally caused harm but does nothing to avoid the inference of intent to harm that necessarily follow Lockhart's deliberate shooting at Owes. Lockhart's own statement demonstrates that he intended to shoot the gun and to cause injury. Whether he intended the precise injuries which occurred is immaterial. We are of the opinion that despite Lockhart's affidavit stating that he fired his gun only to protect himself and to prevent Owes from shooting him, there is no factual issue as to his intent which would preclude granting summary judgment."

579 P.2d at 1122–23 (citations omitted).

Similarly, in *Neilson,* the insured argued that his striking of the victim was done in self-defense. The court stated:

"However, Neilsen [the insured] urges that even under the standard we have accepted, he is entitled to the benefits of coverage because he intended self-defense rather than injury to Smolek. We disagree. The question of self-defense is a standard of Neilsen's liability to Smolek. It presents an issue of motive or justification for an intentionally caused harm, but it does nothing to avoid the inference of intent to harm that necessarily follows the deliberate blow to Smolek's face."

332 N.E.2d at 244. *See also McAndrews,* 349 N.W.2d at 120 (adopting this rationale).

The cases finding that the possible justification of self-defense does not prevent the incident from being an intentional act are clearly in the majority. Their rationale will be applied here.

Under the facts as found by this court, it cannot be claimed that the shooting of Sampson was "neither expected nor intended from the standpoint of the insured." The shooting, therefore, was not an "occurrence" within the meaning of Harford's policy, and Harford cannot be liable for the coverage of Officer Mears.

■ With respect to the claims against Chief Wroten and the City of Cambridge, however, it is clear that the shooting was "neither expected nor intended" from their point of view. Thus the claims made as to them related to "occurrences" under the Harford policy. Since all claims against these defendants had been dismissed prior to settlement, however, none of the $45,000 settlement amount can be attributed to them. Therefore, this court holds that Harford is not liable for any of the amount paid in settlement of the claims in *Sampson.*

B. *Obligation to Defend*

■ Despite the fact that Harford's policy does not cover the shooting, it is possible that Harford could have had an obligation to defend some or all of the defendants in *Sampson,* because the obligation to defend is broader than the obligation to pay a final judgment. This court examined the legal principles governing a dispute as to the existence of an obligation to defend in its Memorandum and Order of May 7, 1984,[20] and will not repeat that discussion here. It is sufficient to state that the insurer has an obligation to defend if, under the facts as alleged in the complaint, there is a "potentiality" that the claim could be covered by the policy. *Brohawn v. Transamerica Insurance Co.,* 276 Md. 396, 407–08, 347 *A.*2d 842 (1975). *See also Southern Maryland Agricultural Association, Inc. v. Bituminous Casualty Co.,*

539 F.Supp. 1295 (D.Md.1982); *St. Paul Fire & Marine Insurance Co. v. Pryseski,* 292 Md. 187, 438 *A.*2d 282 (1981); *Ed. Winkler & Son, Inc. v. The Ohio Casualty Insurance Co.,* 51 Md.App. 190, 441 *A.*2d 1129 (1982).

In the Order of May 7, 1984, this court held that Harford had a duty to defend each of the defendants in *Sampson.* In an oral opinion issued on September 26, 1984, this court adhered to the earlier finding that, looking only at the language of the complaint in *Sampson,* there was a duty to defend on the part of Harford as between it and the insured, and that some formal action would need to be taken in the underlying case eliminating the potentiality of coverage to absolve Harford of its duty to defend. This court also held, however, that the fact that this case involved two insurers made it different from most insurance cases, and if, in fact, Western World assumed the defense and thereby prejudiced Harford, or if the facts were that Western World was in a position to know that the underlying circumstances were beyond the coverage of Harford's policy, then it would be unfair, inequitable, and contrary to law to allow Western World to recover its attorneys' fees for the defense provided in *Sampson.*

■ With respect to the City and Chief Wroten, Harford had a duty to defend. The claims of negligent hiring and supervision were potentially within Harford's policy, and Harford must reimburse Western World for its expenses in defending these two defendants.

■ With respect to Officer Mears, although this court will adhere to its original holding that the claim as alleged in the *Sampson* complaint was potentially within the coverage of Harford's policy, the evidence shows that Western World knew, or should have known through its investigation, that the underlying facts constituted a situation which was outside the coverage of Harford. Although Harford had a duty to represent Chief Wroten and the City, the

---

**20.** Paper No. 14 at 1–4.

"potentiality" rule adopted in Maryland in *Brohawn* did not cause Harford to have a duty to defend all defendants in *Sampson*, simply because one or more defendants had a possible claim against it for indemnification. Where, as here, there are multiple defendants, the insurer must defend only those defendants as to whom claims are made which potentially are within the insurer's coverage.

Furthermore, there is no indication that Western World or its assignors made any attempt to notify Harford of the incident until after Western World observed the ambiguity in the complaint filed by Sampson. In this respect, the case is similar to the case of *Breeding Transport v. American Fidelity and Casualty Co.*, 175 Okl. 508, 54 P.2d 156 (1936). In *Breeding Transport,* the insured owned two trucks, one of which was covered by an insurance policy. When the uninsured truck was involved in an accident, the insured wrote the insurer a letter saying that the truck that had been in the accident was not the one covered by the policy. The complaint filed in the action, however, did not specify which truck had been involved in the accident, and the insured brought a suit for the cost of defending the action. In sustaining a demurrer filed by the insurer, the court found that the insured knew that no claim existed, had proceeded on that basis by paying for his own defense, and only subsequently decided to sue for the cost of the defense because of the ambiguity in the pleading.

In this case, Western World was aware of the shooting from the beginning and was conducting an investigation from that time. Western World did not notify Harford of the incident until after suit was filed, despite the near certainty that a suit would be filed by Sampson. At the time suit was filed by Sampson, it was clear, at least with respect to defendant Mears, that the shooting was an intentional act. Under these circumstances, it would be inequitable to reimburse Western World for the cost of defending Officer Mears.

Harford, therefore, is liable for the entire fee of Mr. Burch in the amount of $19,416.58, because his representation was entirely on behalf of Chief Wroten and the City. Harford is also liable for 15% of Mr. Mackie's fee, or $1,408.84, as the parties stipulated that this amount was in representation of Chief Wroten and the City. Western World is responsible for the remainder of Mr. Mackie's fee, or $7,983.41.

With respect to the $420.75 claimed by Western World as payment to Crawford & Co. for an investigation of Sampson's claim, this cost is a part of the normal operating expense of the plaintiff and not recoverable. In addition, Western World claims $403.65 as costs incurred for depositions. As this amount is not further differentiated, no apportionment is possible, and no recovery will be permitted of this amount.

C. *Liability for Costs of this Action*

In Maryland, the law is settled that an insured may recover from its insurer the attorneys' fees and expenses incurred by the insured in bringing a declaratory judgment action against the insurer for failure to defend. *Cohen v. American Home Assurance Co.*, 255 Md. 334, 258 A. 2d 225 (1969). *See also Travelers Indemnity Co. v. Rosedale Passenger Lines, Inc.*, 55 F.R.D. 494 (D.Md.1972); *Government Employees Insurance Co. v. Taylor*, 270 Md. 11, 310 A.2d 49 (1973). Here Western World has been assigned the rights of the insureds, and unless the circumstances warrant different treatment, Western World stands in the shoes of the insureds.

While Western World has prevailed as to a part of its claims in this action, it has not prevailed as to the monetarily larger part. In the event plaintiff contends under those circumstances that it is nevertheless entitled to recover all or a part of its attorneys' fees and costs incurred in the present suit, it should so advise the court within fifteen (15) days and the defendant will have, in that event, ten (10) days thereafter to respond.

It is SO ORDERED.

## ON MOTIONS FOR RECONSIDERATION

Plaintiff and defendant have both moved for reconsideration of portions of the court's Order of October 31, 1984. No hearing is deemed necessary by the court. Local Rule 6(E).

### I.

The plaintiff pointed out a factual error in the court's Memorandum of that date on page 7, note 13, where the court stated there was no evidence of whether Harrington was a general agent of Harford. As plaintiff correctly stated, Mr. Foley testified that Harrington was a general agent of Harford, and the court so finds as an amendment to its previous findings. Under the circumstances here, however, the fact that Harrington was Harford's general agent is immaterial since "at the time suit was filed by Sampson, it was clear, at least with respect to defendant Mears, that the shooting was an intentional one" (Paper No. 37, p. 22). The implication in the court's prior Memorandum of October 31, 1984 that Harford did not have notice of the shooting until after Western World notified it is erroneous but of no dispositive weight under the circumstances.

### II.

As to the other arguments made by Harford and Western World in their respective motions for reconsideration, the court remains unpersuaded. The cross motions for reconsideration will be denied.

### III.

Western World contends it is entitled to its fees and costs in the sum of $7,731.75 in connection with this present suit in which it has won a partial victory over Harford. If Harford, assuming the legal correctness of the court's ruling of October 31, 1984, disputes the right of Western World to recover *any* of its fees or costs in this suit, it should file a memorandum, with appropriate citations of authority, to that effect within fifteen (15) days. If Harford contests the factual allocation of fees and costs in the sum of $7,731.75, as proffered by the plaintiff, or the reasonableness of the same, Harford should likewise advise the court in writing by that same date, in which latter event an evidentiary hearing will be scheduled, if appropriate.

It is SO ORDERED.