ORDER
 

 HOLMES, District Judge.
 

 This matter comes before the Court on Cross Motions for Summary Judgment by Lutheran Benevolent Insurance Company (“LBI”) and The National Catholic Risk Retention Group, Inc. (“National Catholic”).
 

 Summary judgment is appropriate where “there is no genuine issue as to any material fact,”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);
 
 Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Insurance Corp.,
 
 805 F.2d 342, 345 (10th Cir.1986),
 
 cert. denied,
 
 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and “the moving party is entitled to judgment as a matter of law,” Fed.R.Civ.P. 56(c). In
 
 Celotex,
 
 the Supreme Court stated:
 

 [t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.
 

 477 U.S. at 322, 106 S.Ct. at 2552.
 

 A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts, Fed.R.Civ.P. 56(e), sufficient to raise a “genuine issue of material fact.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242,
 
 247-48,
 
 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (“the mere existence of
 
 some
 
 alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment”) (emphasis in original). “Factual disputes that are irrelevant or unnecessary will not be counted.”
 
 Id.
 
 at 248, 106 S.Ct. at 2510.
 

 Summary judgment is only appropriate if “there is [not] sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.”
 
 Id.
 
 at 250, 106 S.Ct. at 2511. The Supreme Court stated:
 

 [t]he mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.
 

 Id.
 
 at 252,106 S.Ct. at 2512. Thus, to defeat a summary judgment motion, the nonmovant “must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986);
 
 Anderson, 477
 
 U.S. at 249-50, 106 S.Ct. at 2511 (“there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party, [citation omitted]. If the evidence is merely colorable, [citation omitted], or is not significantly probative, summary judgment may be granted.”).
 

 In essence, the inquiry for the Court is “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.”
 
 Anderson, 477
 
 U.S. at 251-52, 106 S.Ct. at 2512. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.
 
 Boren v. Southwestern
 
 
 *1508
 

 Bell Tel. Co.,
 
 933 F.2d 891, 892 (10th Cir. 1991).
 

 I.
 

 In this case, the parties have agreed that summary judgment is appropriate. The parties have stipulated to the material facts and have agreed that there are no remaining issues of fact to be resolved by the trier of fact. Therefore, the Court accepts the agreed upon facts set forth below for purposes of resolving the legal issues presented in the parties’ motions.
 

 LBI issued a series of one year insurance policies to Reverend Beltran, et al. including, but not limited to, The Catholic Diocese of Tulsa (the “Diocese”) covering the period August 1, 1985 through August 1, 1991, with limits of one million dollars ($1,000,000.00) (collectively, “LBI I”). LBI issued another series of one year insurance policies to Reverend Beltran, et al. including, but not limited to, the Diocese covering the period August 1, 1991 through August 1, 1993 with limits of two hundred fifty thousand dollars ($250,000.00) (collectively, “LBI II”). Rev. Morris Dale Vanderford (“Vanderford”) was an insured under LBI II, but only while acting within the scope of his duties as clergyman.
 

 National Catholic issued a one year “excess” insurance policy to the Diocese covering the period August 1, 1992 through August 1,1993 with limits of seven hundred and fifty thousand dollars ($750,000.00) over LBI II’s underlying policy limits of two hundred and fifty thousand dollars ($250,000.00). The National Catholic policy was an excess policy. The policy was an excess following form, which was excess to LBI II.
 

 On or about March 19, 1993, Thomas Luce and Betty Luce, individually and as next friend of their minor son, Glenn K. Luce (collectively, the “Luces”), filed a Petition in a civil action styled
 
 Luce, et al. v. Morris Dale Vanderford, et al.,
 
 Case No. C-93-147 in the District Court of Rogers County, Oklahoma (the “Oklahoma State Court Lawsuit”). In their Petition, the Luces alleged that Vanderford sexually and mentally assaulted their son commencing in May of 1991 and continuing thereafter. The Luces alleged that Vanderford forced their son to commit sexual acts upon him and vice versa at St. Cecelia Catholic Church (the “Church”).
 

 Further, the Luces alleged that Vanderford was an agent, servant, and/or employee of the Diocese and the Church. The Luces asserted intentional tort theories against Vanderford and respondeat superior, negligent hiring, and negligent retention theories against the Diocese and the Church. The Luces demanded damages for extreme emotional distress, mental pain and anguish, and psychological harm.
 

 The Diocese put LBI and National Catholic on notice of the Luces’ personal injury claims after the Oklahoma State Court Lawsuit was filed. LBI defended the Diocese against the Luces’ claims. On or about August 18, 1993, National Catholic agreed to defend the Diocese for and against the Luces’ claims under a reservation of rights pursuant to its August 1, 1992 through August 1,1993 insurance policy.
 

 On or about November 22, 1977, the Diocese retained Vanderford as a Catholic priest. In or about October of 1988, the Diocese assigned Vanderford to the Church. Vanderford sexually abused Glenn Luce at the Church from approximately April of 1991 and continuing thereafter until approximately March 9, 1993, when he was criminally charged. On or about April 29, 1993, Vanderford pled guilty to five counts of forcible sodomy, one count of indecent exposure, and five counts of lewd molestation.
 

 No testimony, documents, or other evidence suggest that the Church or the Diocese knew or should have known of any alleged sexual misconduct on the part of Vanderford until on or after January 1,1992.
 

 In or about January of 1992, the Church and Diocese were first put on notice of sexual misconduct allegations against Vanderford. The Church and the Diocese investigated these allegations. The Church and the Diocese documented the substance of the allegations and their investigation in the memorandum dated January 17,1992.
 

 On or about January 21, 1992, the Church and the Diocese met with Vanderford to dis
 
 *1509
 
 cuss the allegations and the procedures for dealing with such allegations including his suspension. The Church and the Diocese confirmed the substance of the meeting in a letter dated January 21,1992.
 

 The Church and the Diocese referred Vanderford to Laureate Psychiatric Hospital for a psychological evaluation. The evaluation was conducted on February 21, 1992. In or about March of 1992, the Church and the Diocese reinstated Vanderford notwithstanding their knowledge of multiple allegations of sexual misconduct against Vanderford.
 

 The Luces made a settlement demand in the amount of one million dollars ($1,000,-000.00). On or about July 26, 1993, the Diocese wrote a letter to both LBI and National Catholic demanding that they contact the Luces’ attorney to resolve the claims within the limits of policy coverage, if possible.
 

 On or about September 3, 1993 and September 15, 1993, LBI wrote letters to National Catholic requesting it to participate in settlement discussions with the Luces’ attorney and make its policy limits available in a settlement. National Catholic chose not to participate in settlement discussions with the Luces’ attorneys. At the settlement discussions, the Luces, the Diocese, the Church, and Vanderford were able to reach a settlement of the Oklahoma State Court Lawsuit.
 

 On or about October 21, 1993, LBI wrote to National Catholic informing it of the above-referenced settlement and demanded contribution. LBI also put National Catholic on notice of the settlement and LBI invited National Catholic to participate in a hearing to obtain court approval of the settlement.
 

 On or about October 29, 1993, the above-referenced verbal settlement was ultimately reduced to a fully integrated written agreement when the Luces entered into a Settlement Agreement and General Release (the “Lawsuit Settlement”).
 

 In the Lawsuit Settlement, the parties stipulated and recited that “there are no facts supporting any claims against the Church or the Diocese for negligent hiring.” Under the terms of the Lawsuit Settlement, the Diocese agreed to pay the Luces the amount of seven hundred twenty-four thousand nine hundred and ninety-eight dollars ($724,998.00), the Church agreed to pay the Luces the amount of one dollar ($1.00), and Vanderford agreed to pay the Luces the amount of one dollar ($1.00). In exchange, the Luces gave their unconditional and full and final release of all claims against the Diocese, the Church, and Vanderford. For purposes of this Stipulation, the parties agree that the amount of the settlement was fair and reasonable.
 

 Also, on or about October 29, 1993, LBI and the Diocese, the Church, and Vanderford entered into a Settlement Agreement and Assignment of Claims (the “Insurance Settlement”). Under the terms of the Insurance Settlement, LBI agreed to pay the Luces the amount of seven hundred and twenty-five thousand dollars ($725,000.00) on behalf of the Diocese, the Church, and Vanderford pursuant to the terms of the Lawsuit Settlement. In exchange, the Diocese, the Church, and Vanderford assigned to LBI their contractual, equitable, and/or legal subrogation and/or contribution claims against all parties including, but not limited to, National Catholic.
 

 On or about October 29, 1993, the District Court of Rogers County, Oklahoma held a hearing on the Lawsuit Settlement and approved it. National Catholic declined to participate in the hearing.
 

 LBI made a written demand to National Catholic for payment of four hundred and seventy-five thousand dollars ($475,000.00), the difference between the settlement amount and LBI’s policy limits plus costs and expenses including attorneys’ fees and other damages incurred by LBI and its insureds in connection with the Oklahoma State Court Lawsuit.
 

 On or about January 7, 1994, National Catholic declined the demand of LBI to make contribution under its insurance policy for the Diocese’s settlement obligations and/or costs and expenses including attorneys’ fees incurred in the Oklahoma State Court Lawsuit.
 

 
 *1510
 
 II.
 

 Plaintiff argues that the Diocese’s act of negligence, placing Vanderford into a position where he would have contact with young boys after it had knowledge of the sexual misconduct allegations, is covered by the National Catholic excess insurance policy. The negligent retention occurred in or about March 1992. At that time, the Diocese was insured under the excess policy.
 

 In determining whether Plaintiffs claim is covered by the National Catholic excess insurance policy, this Court is guided by the construction principles articulated by the Oklahoma Supreme Court. An insurance policy is a contract and should be interpreted according to the plain meaning of the language embodied in the contract.
 
 Wiley v. Travelers Ins. Co.,
 
 534 P.2d 1293, 1295 (Okl. 1974). “If the terms are unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties.”
 
 Phillips v. Estate of Greenfield,
 
 859 P.2d 1101, 1104 (Old.1993).
 

 Further, an insurance policy should be construed in light of its predominant purpose — to provide coverage to the insured.
 
 Dayton Hudson Corp. v. American Mut. Liability Ins. Co.,
 
 621 P.2d 1155, 1158 (Okl. 1980). Therefore, “in case of doubt”, in interpreting the policy definition of an “occurrence”, the Court construes exclusionary language most strongly against the insurer and liberally in favor of the insured.
 
 See Dodson v. St. Paul Ins. Co.,
 
 812 P.2d 372, 377 (Old. 1991);
 
 All American Ins. Co. v. Burns,
 
 971 F.2d 438, 442 (10th Cir.1992).
 

 Under the National Catholic excess policy, Plaintiff identifies the following language as providing general liability coverage in this case:
 

 [T]he Company agrees with the Insured as follows:
 

 I. COVERAGE
 

 A. To indemnify the Insured against Loss ... by reason of bodily injury ... during the policy period caused by an occurrence which Underlying Insurance provides the following coverage:
 

 (1) General Liability ...
 

 The National Catholic policy does not specifically define the terms, “bodily injury” and “occurrence”, but, instead, adopts by reference the definitions contained in the LBI II primary policy. The underlying policy defines “bodily injury” as:
 

 bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom, including any intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protecting persons or property....
 

 Clearly, the “loss” suffered by the Luces’ minor son as a result his sexual molestation by Vanderford was “bodily injury” as defined in LBI II and, by reference, in the National Catholic excess policy.
 

 The underlying policy defines an “occurrence” as:
 

 an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured____
 

 Therefore, the issue is whether the Diocese’s retention of Vanderford in March 1992 constituted an “occurrence” as defined by the policy.
 

 The policy defines an “occurrence” as an “accident”. The Oklahoma Supreme Court has considered the definition of an “accident” in the context of an insurance policy exclusion; the Court stated:
 

 the words, “accident” and “accidental” have never acquired any technical meaning in law, and when used in an insurance contract, they are to be construed and considered according to common speech and common usage of people generally____ by way of illustration, we quote from Webster’s International Dictionary: Accident. An event that takes place without one’s foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency____ It is an event from an unknown cause, or an unexpected event from
 
 *1511
 
 a known cause, [citation omitted]. An unusual and unexpected result, attending the performance of a usual or necessary-act. [citation omitted]____an event which the actor did not intend to produce is produced by accidental means [citation omitted]____
 

 United States Fidelity & Guaranty Co. v. Briscoe,
 
 205 Okla. 618, 239 P.2d 754, 756-57 (1951).
 
 [1]
 
 The court in
 
 Briscoe
 
 emphasized that courts should construe the word, “accident”, according to its plain meaning.
 
 [2]
 

 Other courts interpreting the word, “accident”, under Oklahoma law have followed the approach of the
 
 Briscoe
 
 court in relying upon the plain meaning of the word, “accident”.
 
 See, e.g., Leggett v. Home Indemnity Co.,
 
 461 F.2d 257, 259-60 (10th Cir.1972) (personal injury sustained by optometrist as a result of inhalation of fumes from dry cleaning plant which adjoined optometrist’s office for five years was not the result of an “accident” as defined by dry cleaner’s insurance policy);
 
 Massachusetts Bay Ins. Co. v. Gordon,
 
 708 F.Supp. 1232, 1234 (W.D.Okla.1989);
 
 see also Republic Nat’l Life Ins. v. Johnson,
 
 317 P.2d 258, 261-62 (Okl.1957).
 

 In
 
 Gordon,
 
 the insured asserted that its insurer had a duty to pay a judgment rendered against the insured in a state court action for assault and battery. The insurer denied coverage on the grounds that an assault and battery was an intentional act and, as such, was not covered by the homeowner’s policy in question. The policy language at issue in
 
 Gordon
 
 covered “bodily injury ... caused by an occurrence____” The policy further defined an “occurrence” as an “accident____” The court examined the claim from the standpoint of the insured when it reasoned that the bodily injury was not caused by an “accident” or an “occurrence” because it “was the natural, reasonably foreseeable, and to-be-expected result of [the insured’s] violent assault”.
 
 Gordon,
 
 708 F.Supp. at 1234;
 
 accord Smith v. Equitable Life Assurance Soc’y,
 
 614 F.2d 720, 723 (10th Cir.1980) (death is “accidental” for purposes of determining insurance coverage “if it w[as] neither reasonably foreseeable, nor the likely consequence of the [insured’s] conduct”). The
 
 Gordon
 
 court agreed with the insurer that the assault and battery was not covered by the policy.
 

 The policy language in
 
 Gordon
 
 replicates the language at issue in the instant ease. Under the
 
 Gordon
 
 rationale, it is clear that, based on the language of the policy in this case, the Court must review the Diocese’s expectation and intent to determine whether the Diocese’s retention of Vanderford in 1992 qualifies as an “accident” or an “occurrence”.
 

 Courts in other jurisdictions have also used a plain meaning analysis when interpreting insurance policies which defined “occurrence” similarly to the policy here. In
 
 Silverball Amusement, Inc. v. Utah Home Fire Insurance. Co.,
 
 the policy at issue contained a definition of “occurrence” with language similar to the definition here: an “occurrence” is defined as an “accident, including continuous or repeated exposure to substantially the same general and harmful conditions.” 842 F.Supp. 1151, 1157 (W.D.Ark.),
 
 affd,
 
 33 F.3d 1476 (8th Cir.1994)
 
 (per curiam).
 
 In the instant case, “occurrence” is defined as “an accident, including continuous or repeated exposure to conditions which results in bodily injury____” Based upon the policy definition of “occurrence”, the
 
 Silverball Amusement
 
 court held that negligent hiring and supervision claims against an employer based on the intentional conduct of an employee who had sexually molested a child fell within the definition of an “occurrence”.
 

 
 *1512
 
 In
 
 Town of Kimball v. Aetna Casualty & Surety Co.,
 
 the Fourth Circuit interpreted an insurance policy clause which was similar to the definition at issue here to include a negligent supervision claim. 667 F.2d 439, 439-40 (4th Cir.1981). The
 
 Kimball
 
 provision stated that:
 

 Aetna shall have a duty to defend against suits alleging accidents which [result] in bodily injury ... neither expected nor intended from the standpoint of the insured.
 

 Id.
 
 at 440. The operative provision here contains identical language: an “occurrence” is “an accident ... which results in bodily injury ... neither expected nor intended from the standpoint of the insured.”
 
 See also, e.g., American States Ins. Co. v. Borbor,
 
 826 F.2d 888, 894-95 (9th Cir.1987) (vicarious liability for partner’s child molestation is not an “intentional act” and is not excluded from policy coverage by California statute which provides that “an insurer is not liable for a loss caused by the wilful act of the insured.”);
 
 United, States Fidelity & Guaranty Co. v. Open Sesame Child Care Ctr.,
 
 819 F.Supp. 756, 758-60 (N.D.Ill.1993) (employer’s alleged negligent hiring of employee who sexually molested child was an occurrence);
 
 Western World Ins. Co. v. Harford Mut. Ins. Co.,
 
 600 F.Supp. 313, 318-21 (D.Md.1984) (city’s negligent hiring and supervision of police officer who shot claimant was an occurrence under general comprehensive liability policy).
 

 These authorities inform this Court’s interpretation of an “occurrence” under the policy provisions in the instant case. The Court finds that, based on the plain meaning of the language of the instant policy, the definition of an “occurrence” clearly was intended to encompass most claims for ordinary negligence. Therefore, the issue becomes whether the facts underlying the negligent retention claim here exclude “occurrence” coverage under the terms of the National Catholic excess policy. In other words, the Court must determine whether the facts in the stipulated record support a finding that the actions of the Diocese were more than ordinary negligence. As discussed below, in such a case the actions of the Diocese might not be covered under the general liability provisions of the policy.
 

 It is undisputed that the Diocese received notice of Vanderford’s alleged sexual misconduct in January 1992. Notwithstanding this notice, Vanderford was reinstated two months later. Although the Diocese had knowledge of Vanderford’s prior misconduct when he was reinstated, the fact that the Diocese possessed this knowledge does not necessarily ascribe to the Diocese the requisite expectation and intent to transform its retention of Vanderford from ordinary negligence into gross or willful negligence — which transformation might exclude the actions of the Diocese from “occurrence” coverage under the general liability section of the policy.
 

 The Oklahoma Supreme Court explained in its landmark negligent retention ease that:
 

 [w]hile “willfulness” and “malice” are implicit in harboring a vicious dog with propensity to bite, there is
 
 no
 
 rule which makes the master’s negligence “willful” or “gross” because he should have anticipated the risk of injury from prior erratic behavior of his servant. Cases in which the master may have had reason to foresee the servant’s injurious conduct from past events doubtless fall into a wide range of variety. We are not prepared to pronounce a
 
 per se
 
 rule for application to the, entire class of litigation. We think the ultimate answer depends in each instance on whether prior knowledge makes the master’s negligence “ordinary” or “gross”.
 

 Dayton Hudson Corp. v. American Mut. Liability Ins. Co.,
 
 621 P.2d 1155, 1161 (Okl. 1980). The Oklahoma statute defines “ordinary negligence” as the “want of ordinary care and diligence”. Okla.Stat. tit. 25, § 6 (1987). “Gross negligence” is defined as the “want of slight care and diligence”.
 
 Id.
 
 Under these statutory definitions:
 

 the employer’s retention of an erratic or unfit servant does not appear to be more than “ordinary” negligence, while engaging a “vicious” person may, under some circumstances, constitute “reckless disregard of safety of others”.
 

 Dayton Hudson Corp.,
 
 621 P.2d at 1161 n. 25;
 
 see also Tillman v. Christian (In re Initiative Petition No. 272),
 
 388 P.2d 290,
 
 *1513
 
 293 (Okl.1963) (prior knowledge of a fact alone, without proof of intentional fraud, willful misconduct, or guilty knowledge, is not tantamount to willfulness of conduct);
 
 Wootan v. Shaw,
 
 205 Okla. 283, 237 P.2d 442, 444 (1951) (even proof of gross carelessness or negligence may not be sufficient to support award of punitive damages under statute requiring fraud, malice, or oppression; “The act which constitutes the cause of action must be actuated by, or accompanied with, some evil intent, or must be the result of such gross negligence, such disregard of another’s rights, as is deemed equivalent to such intent.”). Thus, as a matter of law, the
 
 Dayton Hudson
 
 court made clear that prior knowledge of an employee’s bad acts does not necessarily convert an employer’s negligent retention into willful or gross negligence.
 

 In the instant case, there is no evidence in the record to support the conclusion that the Diocese intended to cause bodily injury to the Luces’ minor son, or to anyone else, when it retained Vanderford or that the Diocese expected that such a result would occur. Thus, under
 
 Dayton Hudson Corp.
 
 and
 
 Tillman,
 
 the Diocese’s prior knowledge of Vanderford’s misconduct, without more, is not sufficient to transform the Diocese’s retention of Vanderford into gross or willful negligence as a matter of law. It follows logically that “an act of negligence completely void of any intent to inflict injury or damage” may be construed as an “accident”.
 
 See Penley v. Gulf Ins. Co.,
 
 414 P.2d 305, 308-09 (0M.1966) (property damage caused by insured’s employee, who negligently placed gasoline instead of diesel fuel in tank truck, was “caused by accident” and covered by insurance policy).
 
 [3]
 

 Applying the above-cited authorities to the terms of the National Catholic excess policy, the Court concludes that the Diocese’s negligent retention of Vanderford constitutes an “accident”. This conclusion is based upon the plain meaning of the policy provision in question. There are no facts in the record evidencing willful conduct by the Diocese which might disturb this conclusion. Further, this conclusion is unaffected by the fact that the subsequent conduct of Vanderford, which conduct formed the basis of the claim against the Diocese for negligent retention, was intentional.
 
 See, e.g., Silverball Amusement, Inc.,
 
 842 F.Supp. at 1163-65 (court should not absolve distinction between intentional and negligent conduct, “allowing the intentional act to devour the negligent act for the purpose of determining coverage.”). Therefore, the Court finds that the Diocese’s negligent retention of Vanderford is an “occurrence” under the policy, and Defendant must indemnify Plaintiff unless there is a basis upon which to exclude coverage of the claim.
 

 Defendant advances two bases in support of its argument that the provisions of the National Catholic excess policy operate to deny coverage for Plaintiffs claim. Defendant first argues that, under
 
 Bums,
 
 the following exclusion in the primary policy applies to bar coverage in the instant case: “this policy does not apply to
 
 personal injury
 
 arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any
 
 insured.”
 
 (emphasis in original).
 
 [4]
 

 In
 
 Bums,
 
 the Tenth Circuit applied an insurance policy exclusion for “personal injury arising out of the willful violation of a penal statute ... committed by or with knowledge of [sic] consent of any insured” to preclude coverage of a negligence claim against a church’s board of directors arising out of a volunteer bus driver’s sexual molestation of two girls. 971 F.2d at 442-43. The
 
 Bums
 
 court considered whether the allegations of negligence involving defendants’ failure to discharge Burns after they became aware of his behavior were alone controlling.
 
 Id.
 
 at 442. In light of the broad language of the penal statute exclusion, the court predicted that “the Oklahoma court would likewise
 
 *1514
 
 view the damage suit petitions as a whole, including the element of the molestations and resulting injuries, which bring into play the penal act exception.”
 
 Id.
 
 at 444.
 
 [5]
 

 Defendant’s reliance upon the
 
 Bums
 
 decision is misplaced. Unlike in
 
 Bums,
 
 under the primary policy in this case, “personal injury” is defined as:
 

 injury which arises out of one or more of the following offenses committed in the conduct of the named insured’s business:
 

 (a) false arrest, detention or imprisonment, or malicious prosecution;
 

 (b) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual’s right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the named insured;
 

 (c) wrongful entry or eviction, or other invasion of the right of private occupancy____
 

 After examining the policy definition for “personal injury”, it is clear that the injury at issue here is “bodily injury” as defined in the policy — and not “personal injury”. There is simply no harm complained of that would fall within the category of “personal injury” as defined in the LBI II primary policy. Therefore, the
 
 Bums
 
 holding is inapplicable to the instant case, and the above-cited penal statute exclusion does not apply to bar coverage of Plaintiffs claim.
 
 Accord Silverball Amusement,
 
 842 F.Supp. at 1158 (distinguishing
 
 Bums
 
 in part because the exclusion in that case differed from the exclusion in the
 
 Silverball Amusement
 
 policy).
 

 Second, Defendant argues that endorsement five of the National Catholic excess policy, entitled “Sexual Misconduct Limited Coverage”, is the proper provision in the policy applicable to claims of sexual misconduct and, further, that Plaintiff should be denied coverage under the terms of this endorsement. The Court concludes, however, that endorsement five does not preempt coverage of Plaintiffs claim under the general liability provisions of the policy.
 

 The general liability provisions and endorsement five offer separate coverages for distinct types of claims. Plaintiffs claims here are not affected by the terms of endorsement five. First, there are no provisions in either policy which support the view that the terms of endorsement five control any and all claims involving sexual misconduct. Second, Defendant has not identified any authority in support of the view that the general liability provisions are preempted by endorsement five. Finally, as stated above, Plaintiffs claim in this case is based upon the negligent retention of Vanderford by the Diocese, the insured. Thus, the provisions of endorsement five do not apply to Plaintiffs claim.
 

 In conclusion, the Court grants Plaintiffs motion for summary judgment and holds that LBI has a legal right to indemnification from National Catholic for the settlement amount and attorneys’ fees and expenses incurred above the primary policy limits.
 

 IT IS SO ORDERED.
 

 [1]
 

 . In
 
 Briscoe,
 
 bodily injuries, which sounded in nuisance, and resulted from a contractor’s use of a cement loading mill were not covered under a contractor's insurance policy because, where cement dust escaped from the mill over a period of four months, the contractor received complaints, sought unsuccessfully to prevent further injuries, and persisted in conduct anyway, the injuries were not "caused by accident”.
 

 [2]
 

 . The court further defined an "accident” by examining whether the event in question was expected or intended by the insured.
 
 See generally Willard v. Kelley,
 
 803 P.2d 1124, 1128-29 (Old. 1990) (approving the judicial approach of gauging the “accidental” character of an event from the insured’s standpoint in the context of life and accident insurance). The policy definition at issue here also refers to bodily injury which was "neither expected nor intended from the standpoint of the insured”.
 

 [3]
 

 .
 
 Cf, e.g., Employers Surplus Lines v. Stone,
 
 388 P.2d 295, 298 (Okl.1963) (liability policy covered its insured, a partnership, for bodily injury resulting from assault and battery of one partner where other partner neither committed nor directed the assault).
 

 [4]
 

 . Under the terms of the excess policy, the claim must be covered under the primary policy before the excess policy provides coverage.
 

 [5]
 

 . The
 
 Bums
 
 court distinguished the
 
 Dayton Hudson Corp.
 
 opinion on the ground that that opinion did not involve a penal statute exclusion but rather “dealt with the question of whether an employer’s own negligence in not discharging an unfit servant is a case in which insurance coverage should not be permitted to protect against the employer’s liability for punitive damages.” 971 F.2d at 445.